Treat as Classified ▓▓▓▓▓▓▓▓▓▓▓▓ Contents Subject to CIPA Protective Order

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Filed with the Classified
Information Security Officer
CISO ▓▓▓▓▓
Date 1 / 17 / 2014

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 10-225 (CKK) |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHEN JIN-WOO KIM, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT STEPHEN KIM'S SEVENTH MOTION TO COMPEL DISCOVERY

Pursuant to the Court's January 7, 2014, Order, defendant Stephen Kim, by and through undersigned counsel, hereby moves this Honorable Court for an order directing the government to produce the following discovery items. This motion is made pursuant to Rule 16 of the Federal Rules of Criminal Procedure as well as Mr. Kim's right to exculpatory information as set forth in Brady and its progeny. See Brady v. Maryland, 373 U.S. 83 (1963).

### INTRODUCTION

As the Court is aware, on December 13, 2013, the defense provided the government with a letter setting forth ten discovery requests. See Dkt. 242, Ex. 1. On December 20, 2013, the parties met and conferred regarding those requests. On January 7, 2014, the government responded by letter and agreed to provide additional discovery as to some of the requested items. See Dkt. 242, Ex. 2. Through the meet-and-confer process and exchange of letters, the parties were able to resolve six of the ten requests made by the defense, in whole or in part.[1] The remaining items are the subject of the instant motion to compel discovery.

---

[1] More specifically, the parties have resolved Items 1, 4, 6, 9, and 10 from defendant's December 13th letter. Item 5 may be resolved, although the government's response (regarding ▓▓▓▓ ▓▓▓▓ records) is ambiguous. See Section E below. Items 2, 3, 7, and 8 remain outstanding and are the subject of the instant motion.

~~Treat as Classified~~ ███████████████████████; ~~Contents Subject to CIPA Protective Order~~

## I.    LEGAL STANDARD

The legal standards applicable to the instant motion are addressed in detail in defendant's prior motions to compel discovery. See, e.g., First Mot. at 4-6. The defense incorporates that earlier discussion by reference. The defense notes, in particular, that under the law of this Circuit, information is discoverable if it helps the defense ascertain the strengths and weaknesses of the government's case or aids the defense's efforts to conduct an investigation to discredit the government's evidence. See United States v. Marshall, 132 F.3d 63, 67 (D.C. Cir. 1998). Discoverable information may also include inculpatory evidence, as "such evidence may 'alter the quantum of proof in [defendant's] favor' in several ways: by preparing a strategy to confront the damaging evidence at trial; by conducting an investigation to attempt to discredit that evidence; or by not presenting a defense which is undercut by such evidence." Id. at 68.

## II.   SPECIFIC ITEMS REQUESTED

### A.    Unauthorized Disclosure to ███████ (Item #2)

On July 2, 2013, the government produced seven pages of material related to a separate unauthorized disclosure of classified information ████████████████████. See Dkt. 118, Ex. 17, at 3; CLASS 3232-38. These materials were apparently produced as a result of the Court's ruling on the government's first set of ex parte CIPA § 4 motions, which required the government to "produce the FBI 302 and related materials discussed in Section III.C.6 of the Memorandum Opinion resolving the Government's motions." See Sealed Order of June 4, 2013; see also Dkt. 118, Ex. 17, at 3. The materials describe ████████████████████████ ██████████████ ██████████, claiming that "one of his colleagues was told by a

~~Treat as Classified~~ ████████████████████ ~~Contents Subject to CIPA Protective Order~~

2

~~Treat as Classified~~ ███████████████████; ~~Contents Subject to CIPA Protective Order~~

senior administration official that the Intelligence Community ██████████ █████
██████████ ." The seven pages produced by the government are attached as Exhibit 1.

Based on its review of those materials, the defense requested further information regarding: "(a) the source of the disclosure to ████████; (b) any overlap between those individuals who accessed the information disclosed to ████████ and those individuals included on the Access List in this case; (c) the government's response to ████████ regarding the disclosure, including whether the government requested that ████████ withhold such information from publication or otherwise alter its reporting; and (d) a copy of any story run by ████████ regarding the information allegedly disclosed." Dkt. 242, Ex. 1, Item 2. The government denied this request, claiming that it "calls for the production of material to which the defense is not entitled." Dkt. 242, Ex. 2, at 2. The defense now moves to compel the production of the requested materials.

The government's claim that the defense is "not entitled" to additional information regarding the unauthorized disclosure to ████████ is puzzling, in light of the Court's earlier ruling. Given the ex parte nature of the earlier proceedings, the defense remains unaware of the basis for the Court's Order directing the government to produce materials related to the unauthorized disclosure to ████████.[1] The Court must have concluded, however, that the disclosure to ████████ is relevant and helpful to Mr. Kim's defense; otherwise, the Court would not have ordered the government to produce materials related to that disclosure. If the

___

[1] The defense notes for the record that it continues to object to the ex parte proceedings that have taken place in this case. During discovery, the government has filed at least five ex parte motions to withhold information from the defense. The government has also been permitted to submit ex parte briefs challenging the use, relevance, and admissibility of certain evidence under CIPA § 6. These ex parte proceedings have deprived the defense of its ability to test the various representations made by the government regarding the documents it has refused to produce during classified discovery in this case.

~~Treat as Classified~~ ███████████████████; ~~Contents Subject to CIPA Protective Order~~

Treat as Classified ███████████████; Contents Subject to CIPA Protective Order

disclosure to ███████ is relevant and helpful to Mr. Kim's defense, the same is also true of specific information relating that disclosure to the charges at issue in this case -- such as whether there is "any overlap between those individuals who accessed the information disclosed to ███ ███ and those individuals included on the Access List in this case." Dkt. 242, Ex. 1, Item 2. The government has thus far failed to explain how the FBI 302 and "related materials" could be discoverable, but the specific information requested by the defense linking the same disclosure to the charged disclosure is not discoverable.

The government's refusal to provide additional discovery regarding the ███████████ disclosure is particularly unpersuasive given the targeted nature of the requests made in defendant's December 13th letter. Rather than requesting all information in the government's possession, custody, or control regarding the disclosure to ███████, the defense made a series of requests narrowly focused on any relationship between the disclosure to ███████ and the charged disclosure, and the manner in which the two "leaks" were handled.

Subpart (a) requested any information regarding "the source of the disclosure to ███ ███." Dkt. 242, Ex. 1, Item 2. This information is relevant and helpful to Mr. Kim's defense because it would identify a government official actively leaking ███████████████ ███ within days of the charged disclosure. The defense cannot investigate whether that person was also the source of the alleged leak to Fox News without learning that person's identity.[3] Moreover, what little information has been provided to the defense to date indicates that the

---

[3] If this person accessed the charged intelligence report, he or she may or may not be on the government's "Access List" in this case. As the Court is aware from prior briefing, the government has been unable to comprehensively determine which individuals accessed the charged intelligence report on June 11, 2009. While electronic audits and document access records have identified dozens of individuals who accessed the intelligence report electronically, many individuals have also been added to the "Access List" because they received the information by word-of-mouth, hard copy, formal briefing, etc.

Treat as Classified ███████████████; Contents Subject to CIPA Protective Order

~~Treat as Classified~~ ███████████████████; ~~Contents Subject to CIPA Protective Order~~

source of the disclosure to █████████ was likely a "high-level" person or a "senior administration official." See Ex. 1 (CLASS_3232). If true, such information also supports the defense's theory that the alleged disclosure to Fox News emanated from senior officials at the National Security Council or the White House, and not from a lower level employee like Mr. Kim.

Subpart (b) requested information regarding "any overlap between those individuals who accessed the information disclosed to █████████ and those individuals included on the Access List in this case." Dkt. 242, Ex. 1, Item 2. The relevance and helpfulness of this information to the defense should be obvious: any "overlap" would consist of those individuals who accessed – and therefore may have disclosed – both pieces of classified information ███████████████ that were allegedly leaked to the media ██████████████████. Such information would be critical to the defense's efforts to demonstrate that someone other than Mr. Kim was the source of the alleged disclosure to Mr. Rosen on June 11, 2009.[4]

Subpart (c) requested any information regarding "the government's response to ████ ████ regarding the disclosure, including whether the government requested that █████████ withhold [the leaked] information from publication or otherwise alter its reporting." Dkt. 242, Ex. 1, Item 2. This information is relevant and helpful to Mr. Kim's defense for several reasons. First, as the Court will recall from prior briefing, the government apparently did not request that Mr. Rosen or Fox News withhold the information at issue from publication or remove it from its website (despite multiple phone calls between Mr. Rosen and government public affairs officials on the afternoon of June 11, 2009). See Third Mot. to Compel at 7-9; Def.'s Reply to Omnibus

---

[4] To reiterate, if evidence of the disclosure to █████████ is relevant and helpful to the defense per this Court's prior Ex Parte Order, then a fortiori any evidence indicating that the information disclosed to █████████ was accessed by an individual who also accessed the charged intelligence report is also relevant and helpful to the defense.

~~Treat as Classified~~ ███████████████████; ~~Contents Subject to CIPA Protective Order~~

5

Treat as Classified ███████████████████████; Contents Subject to CIPA Protective Order

Opp. to Mots. to Compel at 26. Any information demonstrating that the government did make
such a request with respect to the ███████ disclosure would tend to support the defense's
theory that the information at issue in this case, which was not the subject of a similar request by
the government, was not particularly sensitive or closely held (and thus not "national defense
information"), and that Mr. Kim did not have "reason to believe [that the information] could be
used to the injury of the United States or to the advantage of any foreign nation." 18 U.S.C. §
793(d).

Second, information regarding the government's response to the disclosure to ███████
is also helpful to the defense in refuting the government's apparent belief that as-yet-unidentified
NSC officials merely "declined to comment" on the alleged disclosure when they spoke with Mr.
Rosen for several minutes on the afternoon of June 11, 2009. See Dkt. 94 at 3. The disclosure to
███████ took place ████████████████████████ the charged disclosure.
According to the discovery provided to date, the call from ███████ precipitated a process
whereby a public affairs official ███████ documented the inquiry from ███████, informed
the reporter that he would get back to him, and then sought guidance from senior officials as to
███████ would respond to the apparent disclosure. See Ex. 1. That process stands in
stark contrast to the communications between Mr. Rosen and the NSC on June 11, 2009, which
apparently went undocumented. Information regarding the government's response to the
disclosure to ███████ is thus helpful to the defense in demonstrating the manner in which
government officials responded to similar inquiries during the same time period. The fact that
NSC officials who communicated with Mr. Rosen on June 11, 2009, did not follow a similar
process casts doubts on the government's assertion that Mr. Rosen contacted the NSC merely to
seek comment on the information allegedly disclosed to him.

Treat as Classified ███████████████████████; Contents Subject to CIPA Protective Order

~~Treat as Classified~~ [REDACTED]; ~~Contents Subject to CIPA Protective Order~~

Subpart (d) requested "a copy of any story run by [REDACTED] regarding the information allegedly disclosed." Dkt. 242, Ex. 1, Item 2. This information is relevant and helpful to the defense for many of the same reasons described above, namely to help the defense determine (1) whether the intelligence information allegedly disclosed to [REDACTED] was disclosed to the public in a news story without authorization; (2) how the purported sources of the allegedly disclosed information were described in any such reporting; and (3) whether the government responded to the disclosure, and in what manner.[5] The Court has already held that an FBI 302 describing the apparent disclosure is discoverable. The government has offered no principled reason to find that an open source news article describing the same information is not discoverable. Consistent with its prior ruling, the Court should therefore compel the production of the requested materials.

### B. Past Investigations for the Unauthorized Disclosure of Classified Information (Item #3)

As the defense explained in its fifth motion to compel discovery, a recently declassified report indicates that the Office of the Inspector General of the Intelligence Community ("OIG/IC") – and not the FBI – handles a large number of "leak investigations." See Fifth Motion at 17-18. According to the report, OIG/IC implemented "a program to lead IC-wide administrative investigations into unauthorized disclosures of classified information (i.e., 'leak') matters." Fifth Mot. to Compel, Ex. 4, at ii. The OIG/IC Investigations Division "reviewed hundreds of closed cases from across the IC," and "will engage in gap mitigation for those cases where an agency does not have the authority to investigate (multiple agencies or programs) or

---

[5] A search by defense counsel for [REDACTED] report would not resolve this. Even if the defense were to locate a report on its own, the defense's own search cannot confirm that whatever news report it may find was the subject of the FBI 302 and related materials produced by the government. The defense should not be required to guess which [REDACTED] report was the subject of the apparent disclosure.

~~Treat as Classified~~ [REDACTED]; ~~Contents Subject to CIPA Protective Order~~

7

Treat as Classified ████████████████████; Contents Subject to CIPA Protective Order

where DOJ declined criminal prosecution." Id. at 10. As of June 30, 2012, OIG/IC was in the process of "reviewing 375 unauthorized disclosure case files," all of which would have fallen outside of defendant's prior requests because they had not been referred to DOJ. Id. at 16. The information contained in the declassified report differs markedly from the parties' prior understanding during the meet-and-confer process that all such leak investigations were handled by the FBI. See Fifth Mot. to Compel at 17-18.

Based on its review of the declassified report, the defense requested information regarding "any OIG/IC investigation of any individual on the Access List for (a) the unauthorized disclosure of classified information related to North Korea between January 1, 2009, and December 31, 2009; or (b) the unauthorized disclosure of classified information to Fox News." Dkt. 242, Ex. 1, Item 3. The defense also requested the same information regarding any OIG/IC investigations of John Brennan, Mark Lippert, Denis McDonough, and John Herzberg.[6] Id. The government denied this request, asserting that "OIG/IC has not been involved in the investigation or prosecution of the defendant, and that any records in the possession of the Office of the Inspector General of the Intelligence Community are not within the prosecution team's possession, custody, or control." Dkt. 242, Ex. 2, at 2. This response is unavailing, for several reasons.

First, contrary to the government's assertions, OIG/IC records are plainly within the government's "possession, custody, or control" for discovery purposes. Courts within this Circuit have repeatedly held that "documents maintained by other components of the government

---

[6] The defense requested information regarding Messrs. Brennan, Lippert, and McDonough based on the Court's ruling on defendant's second motion to compel discovery. See Op. on Second Mot. at 11-15 (holding that it is "more than reasonable to presume" that these individuals learned of the contents of the charged intelligence report on June 11, 2009). The defense requested information regarding John Herzberg based on his extensive contacts with Mr. Rosen and his access to intelligence reporting on North Korea. See id. at 13-15.

Treat as Classified ████████████████████; Contents Subject to CIPA Protective Order

8

~~Treat as Classified~~ ████████████████████; ~~Contents Subject to CIPA Protective Order~~

which are 'closely aligned with the prosecution' must be produced." United States v. Libby, 429

F. Supp. 2d 1, 6 (D.D.C. 2006) (quoting United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir.

1992)); see also United States v. Poindexter, 727 F. Supp. 1470, 1477-78 (D.D.C. 1989). In this

case, the government cannot seriously dispute that the intelligence community is "closely

aligned" with the prosecution. The case began with a formal request from the intelligence

community for a criminal investigation of the alleged disclosure to Fox News. The intelligence

community provided the government with most of the evidence at issue in the case, including

copies of the intelligence report allegedly disclosed to Mr. Rosen, documents reflecting the

drafting and dissemination of that report, and electronic document access records identifying

those individuals who accessed the report on the date in question. Numerous members of the

intelligence community were made available for interviews with investigators, and will likely be

called as witnesses for the government at trial. The prosecutors themselves commonly refer to

the intelligence community as the "equity holders" in the case, and have requested additional

time from the Court to consult with the IC any time the defense has made discovery requests.[7]

These factors are more than sufficient to warrant a finding that the intelligence community is

"closely aligned" with the prosecution in this case. See Libby, 429 F. Supp. 2d at 9-11 (holding

that the Office of the Vice President and the CIA were "closely aligned" with the prosecution

based on similar factors).

---

[7] See, e.g., Transcript of Status Hearing on June 4, 2013, Dkt. 110, at 4 (Mr. Harvey, requesting
four weeks time after defendant's discovery requests before the Court holds a status conference:
"... what the government would do prior to the status is to coordinate with the intelligence
community regarding any new discovery requests...."); Transcript of Status Hearing on July 9,
2013, Dkt. 147, at 28 (Mr. Harvey, requesting ten days additional time for the government on a
motion to compel schedule: "I would just tell the Court that, this is not the typical case. These
are not typical motions. It involves lots of coordination with the intelligence community.").

~~Treat as Classified~~ ████████████████████; ~~Contents Subject to CIPA Protective Order~~

REDACTED / CLEARED FOR PUBLIC RELEASE

Treat as Classified ████████████████████████; Contents Subject to CIPA Protective Order

The government attempts to avoid this result by distinguishing between the "intelligence community" and the "Office of the Inspector General of the Intelligence Community." The government asserts that because the "OIG/IC has not been involved in the investigation or prosecution of the defendant," its records are not within the government's possession, custody, or control. Dkt. 242, Ex. 2, at 2 (emphasis added). The government cites no authority for the proposition that a sub-component of a government agency (OIG/IC) should be treated as a separate entity for discovery purposes, and the weight of authority runs contrary to any such rule. See Libby, 429 F. Supp. 2d at 6 (holding that the "bureaucratic boundary between agencies is too weak to limit the duty to disclose"); Brooks, 966 F.2d at 1502 (holding that a prosecutor's office cannot avoid disclosure "'by keeping itself in ignorance, or compartmentalizing information about different aspects of a case'" (quoting Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984))); United States v. Marshall, 132 F.3d 63, 69 (D.C. Cir. 1998) ("[A] prosecutor may not sandbag a defendant by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial."); Poindexter, 727 F. Supp. at 1477 (noting that "the government cannot be compartmentalized for purposes of Rule 16 as readily as the [prosecutor] suggests"). Given the "close working relationship" between the government and the intelligence community in this case, see Brooks, 966 F.2d at 1503, permitting the government to avoid disclosing records from a sub-component of the IC "would clearly conflict with the purpose and spirit of the rules governing discovery in criminal cases," as it would permit the government rely on a "plethora" of documents from the IC to build its own case while at the same time denying the defendant access to documents from within the same agency that are "purportedly beyond [the prosecution's] reach." Libby, 429 F. Supp. 2d at 11.

Treat as Classified ████████████████████████; Contents Subject to CIPA Protective Order

REDACTED / CLEARED FOR PUBLIC RELEASE

Even if the government were correct to view OIG/IC as a separate entity for discovery purposes, however, the fact that OIG/IC "has not been involved in the investigation or prosecution of the defendant" is not a legally sufficient reason to deny discovery. The duty to disclose is not limited "to only those files of agencies that participated in the investigation," but rather "turns on the extent to which the prosecutor has knowledge of and access to the documents.'" Libby, 429 F. Supp. 2d at 6 (quoting United States v. Santiago, 46 F.3d 885, 894 (9th Cir. 1995)). The government's January 7th letter does not deny that prosecutors are aware of the OIG/IC records requested by the defendant, nor does it claim that the prosecutors (and their intelligence community liaisons) have been denied access to those documents. See Dkt. 242, Ex. 2, at 2. The January 7th letter thus fails to provide any valid reason why the requested records fall outside the government's possession, custody, or control for discovery purposes.

Second, the requested materials are also relevant and helpful to the preparation of Mr. Kim's defense. As the Court noted in ruling on defendant's second motion to compel discovery, see Op. on Second Mot. at 6-14, the defense "logically" seeks to refute the government's case against Mr. Kim by obtaining evidence indicating that other individuals were leaking classified information during the same time period. Consistent with the Court's prior rulings, defendant's requests have been narrowed to address only investigations for the unauthorized disclosure of classified information related to North Korea, and the unauthorized disclosure of classified information to Fox News. See Dkt. 242, Ex. 1, Item 3. If the government were to discover, for example, that one of the individuals on its Access List has been separately investigated and sanctioned by the OIG/IC for leaking classified information regarding North Korea to James Rosen, such information would be exculpatory and should be produced to the defense. The

Treat as Classified ███████████████████████; Contents Subject to CIPA Protective Order

Court should therefore order the government to search for and produce the requested materials from the intelligence community.

C. ███████ Email (Item #7)

In its Memorandum Opinion on defendant's first motion to compel discovery, the Court ordered the government to produce a copy of an ███████████, email from ████. See Op. on First Mot. at 12. In response to the Court's Order, on July 2, 2013, the government produced a copy of the ███████ email containing no classification markings. See Dkt. 118, Ex. 17, at 1. That email is attached as Exhibit 2. On August 16, 2013, the government produced a "new version" of the ███████ email "with classification markings." See Dkt. 153, Ex. 6, at 1. This "new version" is attached as Exhibit 3. Given the multiple versions of the ███████ email produced by the government, the defense requested any information regarding "whether that email was sent over a classified system and whether that email was marked 'classified' at the time that it was sent." Dkt. 242, Ex. 1, Item 7. The government denied this request, stating that it "calls for the production of material to which the defense is not entitled." Dkt. 242, Ex. 2, at 2.

The government's refusal to provide discovery regarding the original classification status of the ███████ email cannot be squared with the Court's prior Order. The Court directed – and the defense is entitled to receive – a copy of the email as it existed in ███████, indicating whether it was sent over a secure system. The Court did not direct the government to produce a copy of the email with classification markings that had been added four years later.

As the Court recognized in its Opinion on defendant's first motion to compel, the government has already conceded that "wide distribution" of the ███████ email – which details ███████████████████████████████" – "is helpful to the defense's claim that the Defendant did not have reason to believe that the

Treat as Classified ███████████████ Contents Subject to CIPA Protective Order

12

disclosure to Rosen of ████████ could be used to the injury of the United States or to the advantage of a foreign nation." Op. on First Mot. at 13. The original classification status of the ██████ email goes directly to whether that email was "widely distributed," and is therefore discoverable. The fact that high-ranking State Department officials circulated reports of ████████████████████" over unclassified email systems is helpful to the defense that the information contained in the charged intelligence report was not "closely held," and that defendant did not have "reason to believe [that the information] could be used to the injury of the United States or to the advantage of a foreign nation." In light of the government's prior concession, there is no basis for the government's continued refusal to produce information regarding the original classification status of the ██████ email.

### D. Inaccuracy of ██████ (Item #8)

In its Memorandum Opinion denying defendant's motion for reconsideration of the Court's definition of "information relating to the national defense," the Court observed that, "at no point has Defendant Kim suggested to the Court that he intends to argue the information at issue here was inaccurate, ████████████████████████████████████ ███████████████" Op. at 9. As the defense explained at the January 7th Status Hearing, the defense does intend to demonstrate at trial that the information contained in ████ was not accurate (i.e., that it was not genuine "intelligence" and that █████████████ ████████████████ in the report). The defense therefore requested additional discovery regarding the inaccuracy of the charged intelligence report in light of ████████████ ████████████████████████████████████. See Dkt. 242, Ex. 1, Item 8. The government denied this request, stating that it "calls for the production of material to which the defense is not entitled." Dkt. 242, Ex. 2, at 2.

The fact that ██████ was inaccurate is no longer in dispute. At the January 7th Status Hearing, after repeated questioning from the Court, the government reluctantly conceded that the information contained in ██████ was inconsistent with ████████████████████ ████████████████████. As the government is aware, ████ reported that ████████████████████████████████████████████████████████ ████████████████████████████:

- ████████████████████████████ ██████████████████ ██████

- ████████████████████████ ████████████████████████████- ████████████████████."

- ████████████████████████████████

- ████████████████████████ ████████████████ ██████████

Exhibit 4 (CLASS_011). The report also contained various caveats and qualifications regarding its contents. The ████████████," for example, expressly noted that the information contained in the report could be nothing more than "████████████████████ ████████████████" (i.e., newspapers), rather than "████████████████ ████████." Id.

The purported intelligence contained in ██████ differs markedly from ████████████ ████████████████████████████. Contrary to ████████████████████ ████████████████████████████████████:

- ████████████████████████████ ████████████████ ████████████████████████████████

Treat as Classified ████████████████████ ; Contents Subject to CIPA Protective Order



- ' ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████ ..

- ' ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████

Exhibit 5 (CLASS 2685-86) ████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████

For that reason, the defense has requested additional information regarding these inconsistencies between the content of ████████████████████████████ . Such documents would include any documents describing or acknowledging these inconsistencies, and documents analyzing the differences between ████████████████████████ any intelligence reports or other documents addressing ████████████████████ ████████████████████████ , and any documents regarding the origin █

Treat as Classified ████████████████████ ; Contents Subject to CIPA Protective Order

REDACTED / CLEARED FOR PUBLIC RELEASE

Treat as Classified ███████████████████     Contents Subject to CIPA Protective Order

███ of the inaccurate reporting contained in ██████. The requested information is relevant and helpful to Mr. Kim's defense, for several reasons.

First, as the district court held in United States v. Abu-Jihaad, 600 F. Supp. 2d 362 (D. Conn. 2009), a rational jury is entitled to find that "completely inaccurate information" does not satisfy the Espionage Act's requirement that the information at issue "relat[es] to the national defense." Id. at 385-86. In that case, defendant was charged with disclosing "three specific pieces of information" regarding the planned movements and deployment of a U.S. naval fleet. Id. at 384. Defendant argued that one of those three pieces of information – the date upon which the fleet planned to transit the Strait of Hormuz – was not accurate. (The date of transit in the leaked document was April 29th, whereas the fleet actually planned to transit the Strait on May 2nd). Id. at 386. On that basis, defendant argued that the information "could not possibly relate to our national defense" because it was "flat wrong." Id. at 384.

The Court accepted this premise, holding that, "[t]o be sure, completely inaccurate information regarding the battlegroup may well not relate to the national defense." Id. at 386. As the Court explained, "[h]ad there been a large discrepancy between the actual date of transiting and the date set forth in the [leaked document], the Court would agree with [the defendant]" that the inaccurate information was not "national defense information." Id. Given the "proximity" of the leaked date and the actual date of transit, however, the Court held that "the jury was entitled to conclude beyond a reasonable doubt that this information related to the national defense." Id. at 386.

Like the defendant in Abu-Jihaad, Mr. Kim intends to argue at trial that the information contained in ██████ was not national defense information because it was not accurate. Mr. Kim's defense is substantially stronger than Mr. Abu-Jihaad's, as the discrepancies between ██

Treat as Classified ███████████████████     Contents Subject to CIPA Protective Order

16

████████████████████████████ were not minor inaccuracies, as they were in Abu-Jihaad. ████████████████ did not mention ████████████████ described ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. Any documents acknowledging or confirming the inconsistencies between ████████████ ████████████████████████████████ are relevant and helpful to Mr. Kim's defense, as they tend to support his view that the information contained in ████████ does not "relate to the national defense" because it is not accurate. The defense is entitled to present such evidence to the jury so that it may decide whether the information at issue falls within the scope of the Espionage Act.[8] See Gorin v. United States, 312 U.S. 19, 31-32 (1941) (holding that "the connection of the information with national defense" is a jury question); Abu-Jihaad, 600 F. Supp. 2d at 385-86 (same).

Second, the requested materials are also relevant and helpful to the defense in demonstrating that the information contained in ████████ was not "information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation." 18 U.S.C. § 793(d). As the defense has repeatedly pointed out, ████████████ ████████████████████ contains information calling into question the accuracy and provenance of the purported "intelligence." The inconsistencies between ████████ and ████████████████████

---

[8] The defense also notes for the record that information regarding the inaccuracy of ████████ would plainly be discoverable under the definition of "national defense information" advanced by the defendant and applied in other Circuits (but rejected by this Court), which requires the government to prove, inter alia, that the information "is 'closely held' and that its disclosure 'would be potentially damaging to the United States or might be useful to an enemy of the United States.'" United States v. Kiriakou, 898 F. Supp. 2d 921, 923 (E.D. Va. 2012); see also Op. on Third Mot. to Compel at 6-10; Op. on Mot. for Reconsideration at 5-9. Under the defendant's proposed standard, information regarding the inaccuracy of ████████ would go directly to whether the information allegedly disclosed by Mr. Kim was potentially damaging to the United States or helpful to a foreign nation.

████████████████████████████████████

████████████████████████ tend to support the defense's view that a seasoned analyst in Mr. Kim's position would have been quite skeptical of ██████, as it appeared to contain nothing more than speculation and guesswork. The documents requested by the defense would help corroborate this view by confirming that, in fact, the information contained in ██████ was wrong.

E.     ██████████  Records (Item #5)

On August 22, 2013, the government produced substituted ██████ records reflecting ██████ ████████████████████████████████████████████████████████ on June 10-11, 2009. See Dkt. 153, Ex. 7, at 1. These records, however, are virtually meaningless in the form created by the government. In addition to using substitutions for ████████████████████████████, the government also replaced ████████████████████████████████████████████ ████████████████████████████████████████████[9] See Exhibit 6 (CLASS 3699-3749). These substitutions render it impossible for the defense to determine ██████ ████████████████████████████████████████████ on June 10-11, 2009, the very point of the original request. The defense therefore requested "copies of these ██████ records without substitutions for ████████████████████████████████████████████ ████████████ on June 10-11, 2009." Dkt. 242, Ex. 1, Item 5. The defense also requested an unredacted copy of one page of records related to "████████████████████████ which employed the same generic substitution. Id.

The government responded to this request by stating, "We believe that your request calls for the production of material to which the defense is not entitled. Nevertheless, to avoid unnecessary litigation, with respect to the second part of your request, we will re-produce to the



REDACTED  CLEARED FOR PUBLIC RELEASE

Case 1:10-cr-00225-CKK  Document 268  Filed 02/04/14  Page 19 of 22

Treat as Classified [REDACTED]; Contents Subject to CIPA Protective Order

defense a copy of [REDACTED]" Dkt.
242, Ex. 2, at 2. As of the date of this motion, the defense still has not received the discovery
promised by the government, and it is unclear from the government's response whether it intends
to produce the [REDACTED] records without substitutions.[10] To the extent the government has denied
the request for unsubstituted versions of the [REDACTED] records, however, the defense moves
to compel the production of those materials.[11]

This Court addressed the discoverability of [REDACTED] records of [REDACTED] when
it ruled on defendant's fifth motion to compel discovery (and, specifically, on defendant's
request for [REDACTED] records and a filter team process). See Op. on Fifth Mot. at 9.
The Court held that "[t]he [REDACTED] records are certainly material to the preparation of the defense
in that the records would assist the Defendant in determining whether [REDACTED]
might have conveyed the contents of the [REDACTED] report to Mr. Rosen, or to a third party
who then conveyed the information to Mr. Rosen, meaning the records are discoverable under
Rule 16." Id. In light of the Court's ruling, the government cannot seriously dispute that the
[REDACTED] records for [REDACTED] – which would also "assist the Defendant in
determining whether [REDACTED] might have conveyed the contents of the
[REDACTED] report to Mr. Rosen, or to a third party" – are discoverable.

_____

[10] As of the date of this motion, the defense also has not received the discovery promised in
response to Items 4 and 9 of defendant's December 13th letter. In light of this delay, the defense
reserves its right to seek additional relief if the government's production does not adequately
address these requests.

[11] At the January 7th Status Hearing, defense counsel agreed with the Court that four issues from
defendant's December 13th discovery letter remained outstanding. Defense counsel only
received the government's response on the morning of January 7th, and regrettably did not
recognize the ambiguity contained therein with respect to Item #5.

Treat as Classified [REDACTED]; Contents Subject to CIPA Protective Order

19

UNREDACTED - CLEARED FOR PUBLIC RELEASE

~~Treat as Classified~~ ██████████████████; ~~Contents Subject to CIPA Protective Order~~

The only issue remaining before the Court is therefore the form in which the ████ ████ records have been produced by the government. To assist the Court in its determination, the ██████████ records in their present form are attached as Exhibit 6. As the Court will see, these records are essentially meaningless in their present form, as they do not permit the defense to determine ██████████████████████████. The records do not assist the defense in determining whether ██████████████████ "might have conveyed the information to a third party who then conveyed the information to Mr. Rosen," because the ██████████████████████ have been not only excised from the records, but replaced with the same, generic substitution. The defense thus moves to compel the production of unsubstituted copies of the ██████████ records without further delay.

### F. The Government's January 10th Production of Surveillance Materials from 2009-2010

During the January 7th Status Hearing, the Court queried the parties regarding the status of discovery and whether further motions to compel discovery would be necessary. Defense counsel advised the Court that it believed it had received all the discovery the government was going to provide (with the exception of the items addressed in the instant motion and any expert or Jencks materials). The government did not add anything to this exchange. Accordingly, defense counsel informed the Court that it did not foresee any additional motions to compel discovery.

Three days later, on January 10, 2014, the government unexpectedly produced approximately 120 new pages of discovery, as well as a video recording of the defendant. See Exhibit 7 (Jan. 10, 2014, letter from T. Bednar to A. Lowell). This discovery consists of surveillance logs, photographs, and video of the defendant (under the code name "LEMON SHARK") dating back to 2009 and 2010 – including surveillance photographs of the defendant

~~Treat as Classified~~ ██████████████████; ~~Contents Subject to CIPA Protective Order~~

UNREDACTED - CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

~~Treat as Classified~~ ████████████████████ ~~Contents Subject to CIPA Protective Order~~

meeting with his prior attorney. See, e.g., Exhibit 8 (sample surveillance log and photograph). Although these materials have apparently been in the government's possession for years (and were declassified in November 2013), the government did not produce them to the defense or acknowledge their existence until January 10, 2014 – three days after the colloquy with the Court. The government's cover letter offers no explanation for this delay.

On January 16, 2014, defense counsel sent the government a letter seeking additional information regarding this production and requesting any related materials that have not yet been produced. See Exhibit 9. The defense also requested further information regarding steps taken by the government to avoid intruding upon defendant's attorney-client relationship during this surveillance. See id. at 2. The defense awaits the government's response.

Defense counsel is cognizant of the Court's Scheduling Order, and thus brings this issue to the Court's attention in the instant motion. The defendant expressly reserves his right to seek additional discovery regarding the government's belated production of the surveillance materials. Assuming the government responds to the defense's letter in a timely fashion, the defense anticipates addressing this issue no later than the January 28th Status Report.

~~Treat as Classified~~ ████████████████████ ~~; Contents Subject to CIPA Protective Order~~

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED  CLEARED FOR PUBLIC RELEASE

~~Treat as Classified~~ ██████████████; ~~Contents Subject to CIPA Protective Order~~

**WHEREFORE**, for the reasons set forth above and any others appearing to the Court, the defendant seeks an Order compelling the government to produce the materials requested in Items 2, 3, 5, 7, and 8 of defendant's December 13th discovery letter and described herein.

Respectfully submitted,

DATED:  January 17, 2014

_/s/_ Abbe David Lowell
Abbe David Lowell  (DC Bar No. 358651)
Keith M. Rosen  (DC Bar No. 495943)
Scott W. Coyle  (DC Bar No. 1005985)
**CHADBOURNE & PARKE LLP**
1200 New Hampshire Ave NW
Washington, DC  20036

_Counsel for Defendant Stephen Kim_

~~Treat as Classified~~ ██████████████; ~~Contents Subject to CIPA Protective Order~~

22

REDACTED ; CLEARED FOR PUBLIC RELEASE