## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 10-225 (CKK) |
| | ) | |
| v. | ) | |
| | ) | |
| STEPHEN JIN-WOO KIM, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

This memorandum is submitted on behalf of defendant Stephen Kim to aid the Court's review of the Rule 11(c)(1)(C) Plea Agreement reached by the parties. For the reasons set forth below, the defense respectfully submits that a sentence of thirteen months in prison is more than adequate to satisfy the sentencing factors set forth in 18 U.S.C. § 3553(a). The defense thus urges the Court to impose the sentence set forth in the Plea Agreement.

**I.   INTRODUCTION**

This case comes to the Court now as a result of a Federal Rule of Criminal Procedure 11(c)(1)(C) agreement between the government and Mr. Kim. While the charge in the case – a violation of the Espionage Act – is a serious one, an 11(c)(1)(C) plea agreement is particularly appropriate in the setting of this case. The Espionage Act has become the principal vehicle by which the government prosecutes cases involving "leaks" of classified information. However, the Act was passed nearly 100 years ago, and was intended to apply to the offense for which it is named, *i.e.*, espionage. In a case such as this one in which there is no allegation of espionage, an 11(c)(1)(C) agreement is appropriate to ameliorate what would otherwise be the overly severe penalties imposed by the Act (and the sentencing guidelines recommendations that were drafted with actual espionage in mind). Indeed, Rule 11(c)(1)(C) agreements occur more frequently in these kinds of cases precisely to address these issues.

In addition, the circumstances of this particular "leak" case also support resolving the case with the 11(c)(1)(C) agreement submitted by the parties. Mr. Kim was not accused of spying; his illegal conduct consisted solely of talking to a member of the news media with whom others in his office spoke as well. He did not provide documents or other tangible data clearly marked as classified. Mr. Kim spoke to a member of the media fully aware that, as part of their jobs, other government officials – particularly at the State Department – spoke to the media all the time. Mr. Kim also spoke with the media in furtherance of his job responsibilities, to ensure the public understood the facts about a country (North Korea) that has been identified as a state sponsor of terrorism, a country that (as described below) has had a profound impact on his own family. He did not steal any material. He did not receive any payment or other personal benefit for his actions. And while he ended up disclosing national defense information, he has not plead guilty to disclosing information regarding intelligence "sources and/or methods," as the government originally alleged. In fact, news reports from the same day make clear that other government officials were discussing the same subject that Mr. Kim discussed with the news media.

Finally, in the middle of this case – and due to the government's conduct in this investigation – the Department of Justice changed its own guidelines for investigating and prosecuting "leak" cases. See Dep't of Justice, Report on Review of News Media Policies (July 12, 2013) (hereinafter, "DOJ Report"). Among these changes, the Attorney General confirmed that certain information (*e.g.*, private data from journalists) should not be readily obtained and used in criminal cases, and that the government should pursue *non-criminal* resolutions of cases involving disclosures to the news media when appropriate. Id. at 3, 6. Mr. Kim did not obtain the benefit of these changes, but they certainly support the 11(c)(1)(C) agreement in this case.

These factors (described in further detail below), combined with Mr. Kim's personal background and the nature and circumstances of his offense, more than adequately support the plea agreement reached in this case.

## II.   STEPHEN KIM'S PERSONAL HISTORY AND CHARACTERISTICS SUPPORT THE AGREED-UPON SENTENCE

### A.   Background

Stephen Kim's character is the product of his experience as a child of immigrants from Korea. His identity has been uniquely influenced by his family's experience with the conflict on the Korean peninsula, and his deep understanding of the dangers posed by the North Korean state.

Stephen Kim was born on August 15, 1967, in Seoul, Korea. From an early age, his family's history with the conflicts that enveloped the Korean Peninsula throughout the twentieth century had a substantial influence on his own journey. During the Korean War, Stephen's maternal grandfather left his home in Daegu one morning and simply disappeared. The family assumes that he was taken by the North Koreans, who abducted an estimated 82,959 South Koreans (many of whom were educated or had particular skills) during the War and forced them to work for the regime. See Comm. for Human Rights in North Korea, Taken!: North Korea's Criminal Abduction of Citizens of Other Countries 11 (2011). After his abduction, Stephen's maternal grandfather was never heard from again.

Stephen's paternal grandfather passed away during World War II. Stephen's father, Mu Jung Kim, was thus forced to provide for himself and his family at a young age. Beginning in middle school, the elder Mr. Kim worked in the home of a British family, and ran errands on American and Australian military bases in South Korea. These jobs provided Mr. Kim with not only money to support his family, but also with invaluable opportunities to learn English.

When he graduated from high school, Stephen's father was admitted to Seoul National University, the most prestigious university in South Korea. He excelled in college, and accepted a job with a growing export company upon graduation. Because Mr. Kim was one of the rare Koreans fluent in English at that time, the company sent him abroad to meet with potential buyers and obtain sales orders. The company's decision to send him abroad ultimately shaped his family's future.

During the late 1960s and early 1970s, Stephen's father visited more than thirty countries on behalf of the export company. Those travels engendered a deep appreciation for the freedom and opportunity that typified more open societies, and convinced him that his young children (Stephen and his older sister Yuri) would benefit from greater opportunities outside of Korea.

In September 1976, when Stephen was just nine years old, the family immigrated to the United States, settling in the Riverdale section of the Bronx, New York. The transition was difficult for Stephen and Yuri, as neither the children nor their mother spoke any English. Stephen was enrolled in the third grade at Public School 81, where he struggled to learn the language and make new friends. His studies were augmented by lessons with his father, who required the children to read from an illustrated Charlie Brown book every evening to master the language.

Through persistence and hard work, Stephen found his footing and began to excel at school. By the end of the fifth grade, he had made up so much ground that he skipped the sixth grade. Outside of the classroom, however, the transition was more difficult. Stephen and Yuri were the only Korean children in their neighborhood, and were often bullied by classmates. They spent most of their time together, forced to learn to navigate a new city and a new culture on their own.

By the time he reached middle school, Stephen had largely overcome these early struggles, becoming – in the words of his sister – a "typical American kid."  Stephen played several sports, rode his bike until dark, and collected baseball cards.  He was active at his family's church, teaching Sunday school to younger children.  He also helped out at his mother's flower shop, making deliveries throughout Manhattan.

For Stephen's parents, the importance of education for their children was paramount.  Over the ten years that followed, Stephen dedicated himself to higher education, particularly the study of history.  Through hard work and sacrifice by his family, Stephen was accepted to Fordham Preparatory School, a Jesuit school in the Bronx.  After graduating from Fordham Prep, he began his college studies at Georgetown University, enrolling in the School of Foreign Service.  His family's background informed that choice.  Stephen immersed himself in the intellectual environment of the university, studying European history and political thought.  He graduated with a bachelor's degree in History and Diplomacy in 1989.

### B.     Public Service

Although Stephen worked briefly in the private sector after graduation, he ultimately decided to dedicate his professional career to improving American foreign policy on Korea.  While this decision was not financially lucrative, Stephen chose a path to give back to the country that had adopted him and his family.

To further his studies in history and diplomacy, Stephen enrolled in a master's program at Harvard University.  He earned his Master's Degree in International Security from Harvard in 1992, and was accepted into a Ph.D. program at Yale University shortly thereafter.

At Yale, Stephen's professional interests began to take shape.  Because he was a native Korean speaker, Stephen was encouraged to bring his language skills to bear on his particular

5

area of interest, military and diplomatic history.  Stephen began to study the history of foreign relations between the United States and Korea.  He earned his Ph.D. in Diplomatic and Military History in 1999.  His dissertation on the alliances formed by Syngman Rhee, the first President of South Korea, was published two years later.

After completing his academic studies, Stephen applied his unique personal and educational background to a number of positions within the federal government.  From 2000 to 2002, Stephen served as a research analyst for military operations and East Asian affairs at the Center for Naval Analyses.  In that role, he provided support for both Operation Enduring Freedom (Afghanistan) and Operation Allied Force (the former Yugoslavia).  He was also charged with analyzing North Korean and East Asian security issues for the Center and examining Korean open source publications in their native format.

From 2002 to 2006, Stephen served as the senior all-source analyst for East Asia and North Korea in the Non-Proliferation, Homeland and International Security ("Z") Division at Lawrence Livermore National Laboratory ("LLNL").  At Z Division, he was tasked with analyzing North Korean regime stability, military command and control issues, and North Korea's nuclear weapons program.  He also briefed a number of senior military and political officials, including Vice President Cheney, National Security Adviser Stephen Hadley, former Secretary of State Henry Kissinger, and the Defense Policy Board.

From 2006 to 2007, Stephen was assigned to the Center for Global Security Research at LLNL.  While at the Center, he continued his research on nuclear latency and the role of nuclear weapons in strategic deterrence for the twenty-first century.

In June 2007, Stephen accepted a position in the Office of Net Assessment at the Department of Defense.  As a special assistant to the Director of Net Assessment, Stephen was

responsible for analyzing intelligence reporting on Chinese nuclear strategy, strategic deterrence, and North Korea. He also served as Net Assessment's liaison to LLNL on issues relating to weapons of mass destruction.

In June 2008, Stephen accepted a position as the Senior Advisor for Intelligence in the Bureau of Verification, Compliance, and Implementation ("VCI") at the Department of State. This was the position that he held at the time of the events at issue in this case. At VCI, Stephen was responsible for advising the Assistant Secretary of State on all intelligence matters related to arms control and nuclear proliferation, including North Korea's nuclear program. He was asked to review all incoming intelligence reports and provide briefings to agency principals.

At the time of his indictment, Stephen Kim had thus served his country in various capacities for close to a decade. He was widely regarded as one of the nation's foremost experts on the North Korean regime, and possessed a combination of skills and experiences that had proved invaluable to those who relied on his insights and analysis. Until the incident at the core of this case, Stephen had a stellar career in public service dedicated to protecting his adopted country from the menace that his family had experienced firsthand in Korea. Stephen's service to this country and his family's experiences with the North Korean regime do not excuse the mistake that he made in speaking too openly with a reporter, but they help to place that single mistake in context. Indeed, one of the many tragedies in this case is that Stephen will not be able to apply his unique abilities to this important area of foreign policy in the future – a loss to both Stephen and to our country.

## III.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE WARRANT THE VARIANCE TO WHICH THE PARTIES HAVE AGREED

In addition to "the history and characteristics of the defendant," the Court must also consider "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). A review of the

facts described in the Statement of Offense filed with the Court (Dkt. 273) makes plain that a thirteen month sentence is appropriate in this case.

First, although Mr. Kim orally disclosed national defense information to a reporter on a single occasion on June 11, 2009, he did not reveal intelligence sources or methods. As the Court is aware, the government initially charged Mr. Kim with disclosing an intelligence report "concerning intelligence sources and/or methods and intelligence about the military capabilities and preparedness of a particular foreign nation." See Indictment, Dkt. 3, at 1. The Statement of Offense no longer contains any allegation regarding sources and methods, stating only that Mr. Kim disclosed information "specifically about the military capabilities and preparedness of North Korea." See Statement of Offense, Dkt. 273, ¶ 1. This is therefore not a case in which this defendant is being charged or sentenced for willfully disclosing information that would endanger a source or jeopardize this country's intelligence-gathering capabilities. Moreover, articles from other news agencies on the same date demonstrate that Mr. Kim was not the only government official to discuss development in North Korea with the news media on June 11, 2009. While the government may claim in its sentencing memorandum that Mr. Kim's disclosure seriously damaged national security, any such statement paints with too broad a brush when compared to the actual conduct at issue.[1]

---

[1] In its sentencing memorandum, the government relies on additional facts outside of the Statement of Offense. See Gov't Memo. at 9-10 & nn.4, 5. It is not clear to defense counsel whether the materials relied upon by the government have been declassified. In any event, defendant does not agree with the government's characterization of statements or facts outside of the parties' stipulated Statement of Offense. Moreover, the defense specifically notes that defendant's alleged statements to the FBI were the subject of a motion to suppress, which remained pending at the time of the plea agreement in this case.

Second, the Statement of Offense also makes clear that Mr. Kim did not disclose a massive quantity of classified information. Rather, Mr. Kim was charged with (and pled guilty to) speaking with the reporter on one occasion on one day regarding the information contained in a single intelligence report, regarding the anticipated actions of a single foreign country. See Statement of Offense, Dkt. 273, ¶¶ 1, 7. While the information contained in that report was classified, similar information had been previously reported in the media, and former Undersecretary of State John Bolton described it as "neither particularly sensitive nor all that surprising." See Michael Isikoff, 'Double Standard' in White House Leak Inquiries?, NBC News, Oct. 18, 2010. This case is therefore unlike other cases about which the Court and the public may be aware (*e.g.*, Chelsea Manning or Edward Snowden), in which the leaker allegedly stole and disclosed volumes of written classified documents, including sensitive information regarding our nation's military and intelligence capabilities. Indeed, Mr. Kim did not procure or disclose a single document to the media, nor did he leak any information regarding sensitive intelligence sources or methods.

Third, unlike most Espionage Act cases, the government has not alleged that Mr. Kim gained anything personally from the disclosure. Mr. Kim did not sell information to the reporter or to a foreign country, nor did he receive payment of any kind for his actions. Mr. Kim did not steal classified documents, nor did he improperly retain such documents for an improper purpose. Mr. Kim had reason to know that he should not have engaged in the type of conversations with Mr. Rosen that took place on June 11, 2009, but he did not obtain any personal benefit from his actions. This is therefore not a case in which the defendant placed money or personal gain ahead of loyalty to his country.

The defense raises these issues not to minimize Mr. Kim's offense, but rather to point out that this case falls outside the "heartland" of a classic Espionage Act prosecution and to explain why an 11(c)(1)(C) plea and its "wired" sentence is the appropriate outcome in this case. The Statement of Offense confirms that Mr. Kim was not trying to expose government waste or fraud when he spoke with the reporter, but that does not mean that he acted with an improper motive when he discussed North Korea with Mr. Rosen on June 11, 2009. He was not a spy leaking information to a foreign intelligence service. He was not an ideologue leaking information to forward a particular political agenda. He was not a mercenary leaking information for personal gain or financial wealth. Rather, Mr. Kim was a dedicated public servant who had served his nation admirably for over a decade, but who made a mistake on this occasion and spoke with a reporter assigned to gather information from the State Department. Mr. Kim has taken responsibility for that mistake, and regrets that it happened. But his case bears little resemblance to the Espionage Act prosecutions that have preceded it, as the nature and circumstances of his offense are fundamentally different than those of the individuals who have been prosecuted before him.

## IV. THE SENTENCING RATIONALES SET FORTH IN 18 U.S.C. § 3553

The sentencing rationales set forth in 18 U.S.C. § 3553(a)(2) also do not compel a significant prison sentence in this case. In addition to the personal characteristics of the defendant and the nature and circumstances of the offense, Section 3553(a) directs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). These factors are addressed in turn below.

### A.   Respect for the Law and Just Punishment

First, a more lengthy prison term is not necessary to reflect the seriousness of the offense, to promote respect for the law, or to provide just punishment. During proceedings in this case, the Department of Justice changed its own guidelines to clarify that leaks to the news media (like the one in this case) should normally be addressed administratively, not criminally. See DOJ Report at 6. Although more serious, mass disclosures might warrant a criminal referral, the type of conduct at issue in this case does not warrant criminal proceedings or a significant prison term. To the contrary, the new Department policy acknowledges that these types of singular disclosures should have been resolved through the removal of security clearances and other administrative actions. Id. Mr. Kim did not receive the benefit of DOJ's new policy, but his case would have served as the quintessential example of a case warranting *non-criminal* treatment. The government's new policy thus provides powerful affirmation of the resolution reached in this case.

In addition, Mr. Kim has already paid a steep price for his contacts with the reporter. He has lost his security clearance, his job, and his (and his family's) life savings. His marriage dissolved as a result of the pressures and stress of his arrest and prosecution, and he was forced to move out of his home. Government officials at every level speak with news reporters on a daily basis in Washington, DC. As this Court well knows, many of those conversations include the disclosure of classified information – a fact often confirmed in the news articles themselves. Yet few, if any, of those officials have paid the price that Mr. Kim has paid for a single conversation with a reporter. To the contrary, some of these officials have even been promoted

11

to higher positions in the administration. A lengthy prison term is not necessary to promote respect for anti-disclosure statutes, as the government's decision to prosecute Mr. Kim was more than sufficient to achieve that goal.

### B.      Deterrence

For many of the same reasons, a lengthy prison term also is not necessary to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Mr. Kim has already lost his security clearance, his job, his wife, and his personal savings. He will carry a felony conviction henceforth, which will make a future career in civil service or foreign policy very difficult (likely impossible) to achieve. After working so hard for so many years to build a career in his adopted country, Mr. Kim must literally begin all over again. A lengthy prison term therefore is not necessary for specific deterrence, as he has already lost everything and will never again be in a position to access classified information.

Any need for general deterrence has also been satisfied by the government's decision to bring charges against Mr. Kim in the first instance. As noted above, during proceedings in this case, the Department of Justice announced that similar conduct will be addressed administratively in the future. A lengthy criminal sentence therefore would not serve the government's stated enforcement goals. Moreover, those with access to classified information are already aware of the potential, real-world consequences of any unauthorized disclosure. To the extent that one believes in the ability of a sentence in a single criminal case to have a general deterrent effect, a felony conviction and sentence of thirteen months in prison is more than adequate to deter other lower-level employees like Mr. Kim from disclosing classified information. The prosecution of senior government officials who routinely leak classified information to the news media to forward their own agendas (with apparent impunity) would

much better serve any purported interest in general deterrence, as it would tend to dispel the notion that the government has singled out a few lower-level employees like Mr. Kim while turning a blind eye to the conduct of more senior officials.

### C. Protection from Further Crimes

A lengthy prison term also is not necessary to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). Prior to the events at issue, Mr. Kim had no criminal history, and had dedicated most of his adult life to public service. For nearly a decade, Mr. Kim had access to a trove of sensitive and classified information. He has been charged, prosecuted, and convicted for a single mistake, occurring on one unfortunate day of an otherwise law-abiding and productive life. There is simply no reason to believe that he would engage in criminal activity in the future. In addition, based on the present offense, the government has already stripped Mr. Kim of his security clearance. He therefore will not have access to the type of information at issue in this case in the first instance.

### D. Treatment and Training

Finally, a lengthy prison term is not necessary "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The offense at issue resulted from a single lapse in judgment in an otherwise stellar career of public service; it was not the result of any medical condition or deficit requiring additional training. Mr. Kim's professional and educational achievements make clear that he is well-equipped to try to rebuild a successful career upon his release.

## V. CONCLUSION

Mr. Kim committed a serious offense. The agreed-upon sentence in the Plea Agreement is "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to adequately address that

offense. Taken together, the history and characteristics of the defendant, the nature and circumstances of the offense, and the sentencing factors described in Section 3553 all support a sentence of thirteen months in prison. The defense thus respectfully urges the Court to impose the sentence contained in the parties' Rule 11(c)(1)(C) Plea Agreement.

Respectfully submitted,

Dated: March 24, 2014

_____/s/_____
Abbe David Lowell (D.C. Bar No. 358651)
Keith M. Rosen (D.C. Bar No. 495943)
Scott W. Coyle (D.C. Bar No. 1005985)
CHADBOURNE & PARKE LLP
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 974-5605 (Telephone) (Lowell)
(202) 974-5687 (Telephone) (Rosen)
(202) 974-5713 (Telephone) (Coyle)
(202) 974-6705 (Facsimile)
ADLowell@Chadbourne.com
KRosen@Chadbourne.com
SCoyle@Chadbourne.com

*Counsel for Defendant Stephen Kim*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2014, I caused a true and correct copy of the foregoing notice to be served via the Court's ECF filing system to all counsel of record in this matter.

/s/
Abbe David Lowell
